25-MJ-6286-MPK

# HONAFFIDAVIT IN SUPPORT OF AN APPLICATION
# FOR A SEARCH WARRANT

I, Michael J. McGee, being first duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of an application for a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure for the subject premises located at 52 Sunnyside Street, 3rd Floor, Hyde Park, Massachusetts 02136, currently being utilized by Carlo de los SANTOS RUIZ, a.k.a. "Julio," and the SANTOS RUIZ Drug Trafficking Organization ("DTO") ("Target Premises-4"). Target Premises-4 is discussed herein and described and depicted in Attachment A, and the items to be seized are discussed herein and described in Attachment B.

2. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I also am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and authorized to apply for the requested search warrant.

3. I am employed as a police officer with the Manchester, New Hampshire Police Department ("MPD") and have been so employed since July 2014. Since March 2021, I have also been a Task Force Officer ("TFO") for the Federal Bureau of Investigation and a member of the New Hampshire Major Offender Task Force, which works to dismantle and disrupt criminal groups like DTOs and street gangs operating in New Hampshire and Massachusetts. I am the primary case officer with

responsibility over the investigation described herein.

4. During my law enforcement career, I have had the opportunity to search, seize, and personally observe what I have recognized to be, and what was later confirmed through laboratory analysis, controlled substances like fentanyl, crack cocaine, powder cocaine, heroin, methamphetamine, marijuana, hashish, and illegally manufactured and obtained pharmaceutical drugs. In addition to attending trainings about narcotics and gang interdiction, I have physically and electronically tracked and surveilled drug traffickers, bought drugs from drug dealers while operating as an undercover officer ("UC"), debriefed drug dealers, confidential sources ("CS"), and other witnesses with personal knowledge about DTOs and the way they operate, arrested targets of narcotics investigations, reviewed recorded conversations like phone calls and electronic messages, and reviewed telephone, financial, and drug records, all related to drug trafficking. I have also been the affiant on and have led or assisted in the execution of search warrants in which common "tools" of the drug trade were found, like drugs, drug proceeds, drug paraphernalia, and firearms. I have also been a member of several specialized units at MPD including the Anti-Crime Unit and the Gang Prevention Unit, both of which focused on deterring and apprehending violent offenders and gang members in Manchester. I have also received specialized investigatory training in numerous areas including gang investigations, drug investigations, criminal interdiction, and am a certified Professional Gang Investigator by the East Coast Gang Investigators Association.

25-MJ-6286-MPK

5. The facts in this affidavit come from my personal observations, my personal training and experience, and the information that I have received from other law enforcement agents and witnesses involved in this and other investigations. This affidavit is intended to show merely that there is sufficient probable cause for the issuance of the requested search warrant and does not set forth all my knowledge about this matter.

6. Based on my training and experience and based on the facts set forth in this affidavit, I submit there is probable cause to believe that SANTOS RUIZ has committed and continues to commit federal drug offenses involving conspiracy to distribute and possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (collectively, "Target Offenses"), within the District of New Hampshire and elsewhere.

7. Based on my training and experience, and based on the facts set forth in this affidavit, I submit that there is probable cause to believe that Premises-4 contains evidence, fruits, and instrumentalities of the Target Offenses.

## PROBABLE CAUSE

8. On June 17, 2025, United States Magistrate Judge M. Page Kelley in the District of Massachusetts issued a search warrant under Docket No. 25-MJ-6283-MPK, incorporated by referenced herein, authorizing investigators to search 220 Hamilton Street, Dorchester, Massachusetts 02122 ("Target Premises-2"), for electronic devices, like SANTOS RUIZ's cellphone with assigned call number: (603) 818-0291 ("Target Telephone"), and tangible documents pertaining to occupancy at

Target Premises-2. Exhibit 1.

### Investigation at Target Premises-2

9. On June 18, 2025, at approximately 6:00 AM, agents executed that search warrant at Target Premises-2 and arrested SANTOS RUIZ on a federal arrest warrant because SANTOS RUIZ has been charged in a single-count indictment in the District of New Hampshire under Docket No. 25-cr-42, with conspiracy to distribute a controlled substance, namely, fentanyl and cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(vi), 841(b)(1)(C), and 846. During the execution of this search warrant at Target Premises-2, agents seized approximately two (2) cellphones, a laptop, approximately $1,000 cash, but did not locate any narcotics inside Target Premises-2. I do not know whether any of these cellphones seized from Target Premises-2 is the Target Telephone.

10. Parked on the street around the corner from Target Premises-2 was a known runner car for the SANTOS RUIZ DTO, a gray Hyundai Santa Fe with New Hampshire plate: 5553732 ("gray Santa Fe"). Agents ran a narcotics-detecting K-9 around the gray Santa Fe but that K-9 did not alert to the presence of the odor of narcotics. However, agents also arrested Robert Alexis PENA LARA inside Target Premises-2 at the same time they were arresting SANTOS RUIZ. PENA LARA is a known runner for the SANTOS RUIZ DTO who sold narcotics to a UC in Manchester, New Hampshire on numerous occasions, including as recently as June 10, 2025.

11. During a post-*Miranda* interview, PENA LARA told agents that he parked a gray Sante Fe near Target Premises-2. PENA LARA said that a person he

calls "Julio" stocks the gray Santa Fe with drugs every day. PENA LARA said that PENA LARA then drives the gray Santa Fe to Manchester to conduct drug deals and then returns to Boston where he parks and keeps the money from the day's sales inside the gray Santa Fe. PENA LARA told agents that he believed there would be money inside the gray Santa Fe but not drugs. I believe the gray Santa Fe which was parked near Target Premises-2 and upon which the narcotics-detecting K-9 did not alert is the same gray Santa Fe that PENA LARA was referencing with agents.

12.     After interviewing PENA LARA, agents then searched the gray Santa Fe and found inside the center console approximately six hundred (600) grams of suspected narcotics, which I believe is consistent with fentanyl, wrapped inside green cellophane. No money was found inside the gray Santa Fe.

### Investigation at Target Premises-4

13.     On June 18, 2025, at approximately 1:00 PM, agents traveled to 52 Sunnyside Street in Hyde Park, Massachusetts to conduct a "knock and talk" with any occupants at that address. I know about this address because it was associated with the SANTOS RUIZ DTO. After a controlled buy in August 2024 from the SANTOS RUIZ DTO, agents followed the "runner" from that controlled buy back to 52 Sunnyside Street. Agents have also observed known "runner" cars for the SANTOS RUIZ DTO parked near Target Premises-4 on Sunnyside Street, Church Street, and Drury Road at various times in approximately September through November 2024. Agents, however, have not seen "runner" cars for the SANTOS RUIZ DTO parked in the driveway to 52 Sunnyside Street.

14. I also know about this address because I have reviewed location data for the Target Telephone, pursuant to a federal GPS/ping warrant under Docket No. 25-mj-107-01-TSM. I believe SANTOS RUIZ has utilized the Target Telephone to commit the Target Offenses. The location data that I have reviewed shows that in the past few days, namely, on June 7, June 9, June 11, June 14, and June 16, 2025, the Target Telephone had pinged in the vicinity of 52 Sunnyside Street.

15. Upon arriving at 52 Sunnyside Street, agents encountered a civilian witness ("CW-1"), who appeared to be taking out trash from 52 Sunnyside Street. Agents asked CW-1 whether they knew someone named "Carlo," which I know is SANTOS RUIZ's first name. CW-1 confirmed that CW-1 knew a "Carlo," specifically, a "Carlo Ruiz," who CW-1 met approximately two years ago at a barbershop. CW-1 also said that "Carlo Ruiz" had been renting a bedroom from CW-1 at Target Premises-4 for approximately $1,100 per month. Target Premises-4 is a two-bedroom apartment consisting of the entire 3rd floor at 52 Sunnyside Street. CW-1 also lives in/maintains one of those bedrooms inside Target Premises-4. CW-1 said that "Carlo Ruiz" first began renting the other bedroom at Target Premises-4 from CW-1 around one year ago, stopped renting from CW-1 for a few months, and then recently began renting again from CW-1 a few months ago.

16. CW-1 said that "Carlo Ruiz" helped CW-1 insure CW-1's white 2014 Audi A4 with Massachusetts plate: 5PPP15 ("white Audi"). CW-1 identified that this white Audi was parked close to the building which contains Target Premises-4. Agents confirmed that this white Audi was parked nearby. Additionally, agents ran

the plate for the white Audi and learned that a "Carlo Miguel de los Santos Ruiz" is currently registered to the white Audi. I believe that SANTOS RUIZ is "Carlo Miguel de los Santos Ruiz" because the white Audi's registration also had the same birthdate as SANTOS RUIZ and a prior address where he lived.

17. CW-1 described the person CW-1 knows as "Carlo Ruiz" as a Hispanic male with black hair, standing approximately six feet tall, and weighing approximately two hundred pounds. I believe that CW-1's description for the person who CW-1 knows as "Carlo Ruiz" matches SANTOS RUIZ's description.

18. CW-1 also said that "Carlo Ruiz" drives a white CRV. I know that during this investigation, agents have seen SANTOS RUIZ utilizing a white 2018 Honda CRV with Massachusetts plate: 6PLE19 ("white CRV"), which is registered to SANTOS RUIZ's wife/girlfriend Yafreisy Concepcion MEJIA BAEZ. While executing the search warrant at Target Premises-2, agents observed the white CRV parked in the driveway outside Target Premises-2. Agents searched the white CRV and did not locate any narcotics-related items inside. However, during a surveillance operation on June 16, 2025, agents observed SANTOS RUIZ driving the white CRV from Target Premises-2 to an area on Sunnyside Street and parked in close proximity to the building containing Target Premises-4. Agents, however, did not want to alert SANTOS RUIZ of their presence ahead of the search warrant execution date on June 18, 2025, so agents broke off surveillance and did not see whether SANTOS RUIZ actually entered the building containing Target Premises-4.

19. Agents showed CW-1 a profile picture from SANTOS RUIZ's Facebook

account but without any identifying markings or language like SANTOS RUIZ's name. CW-1 confirmed that the person depicted in that Facebook profile picture is the person CW-1 knows as "Carlo Ruiz," but who I know is SANTOS RUIZ.

20.     CW-1 said that they see SANTOS RUIZ at Target Premises-4 at various times, meaning sometimes CW-1 sees SANTOS RUIZ at Target Premises-4 once weekly, other times CW-1 sees SANTOS RUIZ at Target Premises-4 once monthly.

21.     Agents also located a green 2000 Nissan Altima with New Hampshire plate: 5429197 ("green Nissan"), parked near the building containing Target Premises-4. I know that this green Nissan is a runner car for the SANTOS RUIZ DTO because it was utilized during a controlled buy in Manchester from the SANTOS RUIZ DTO on July 10, 2024. Agents ran a narcotics-detecting K-9 around the green Nissan and that K-9 alerted to the presence of the odor of narcotics. Agents then searched the green Nissan and found inside the driver's side door panel two wrapped packages containing suspected narcotics, that I believe are consistent with fentanyl. One of the packages of suspected narcotics was wrapped in a clear plastic bag. The other package of suspected narcotics was wrapped in green cellophane

22.     CW-1 invited agents inside Target Premises-4. Inside Target Premises-4, agents observed in plain view in Target Premises-4's kitchen green cellophane wrapping. I know that drug traffickers use cellophane wrapping to package drugs for distribution. CW-1 said that SANTOS RUIZ sometimes asks CW-1 to clean things for SANTOS RUIZ. CW-1 showed agents in the kitchen several sifters that CW-1 had cleaned for SANTOS RUIZ. I know that drug traffickers use sifters to mix drugs with

cutting agents. CW-1 also told agents which bedroom belonged to SANTOS RUIZ. Agents observed that SANTOS RUIZ's bedroom door was open but agents did not enter inside. Nevertheless, agents observed in plain view through the doorway to SANTOS RUIZ's bedroom a box which contained other smaller boxes containing Ziploc-style baggies. I know that drug traffickers use Ziploc-style baggies to package drugs for distribution.

23. CW-1 told agents that SANTOS RUIZ has full access to Target Premises-4. Agents told CW-1 that SANTOS RUIZ had been arrested on narcotics-related charges and CW-1 responded that CW-1 believed that SANTOS RUIZ was selling drugs.

24. After observing the suspected narcotics-related paraphernalia in plain view in Target Premises-4's kitchen and through SANTOS RUIZ's open bedroom door, agents then froze Target Premises-4 in order apply for this warrant. As set forth above, because SANTOS RUIZ has full access to Target Premises-4 and not just the bedroom which SANTOS RUIZ rents from CW-1, I am seeking to search the entirety of the 3rd floor apartment that comprises Target Premises-4.

25. Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, hotel rooms, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug

inventory and drug related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and Ziploc bags, in residences or other locations they access with frequency.

26. It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such recordkeeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

27. Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is

common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

28. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

29. It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug

proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

30. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

31. Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

32. Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

33. It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

34. I know that individuals typically hold their telephone on their person or in their residences. Based on my training and experience, I know that drug traffickers commonly use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash

houses or at the dealers' own residences.

35. Based on my training and experience, I know that those involved in drug distribution routinely use cell phones to conduct their business. Cell phones are used to communicate with suppliers, customers, and other co-conspirators.

36. It is common for drug traffickers to retain cell phones, although not necessarily used, for months or longer by drug traffickers in their residences and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

37. Evidence of drug crimes can be found in the cell phones and smart phones. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like WhatsApp, Textnow, Signal, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from

where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or CashApp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

38. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

39. Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and

banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in relation to other evidence.

40. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities to protect themselves or attempt to intimidate potential cooperators.

41. It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily

transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

42. Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the location of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of Target Premises-4. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of

these units may be kept in residences.

## CONCLUSION

43. Based on the information described above, I submit there is probable cause to believe that SANTOS RUIZ has committed the Target Offenses and that Target Premises-4, further described and depicted in Attachment A, contains evidence, fruits, and instrumentalities of the Target Offenses, further described in Attachment B.

Respectfully submitted,

/s/ Michael J. McGee
MICHAEL J. MCGEE
Task Force Officer
Federal Bureau of Investigation

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by Telephone

Page Kelley
HON. M. PAGE KELLEY
United States Magistrate Judge
on June 18, 2025